# Exhibit B

# PRIVATE ARBITRATION

AWS OPPORTUNITY FUNDS I, LLC an Arizona limited liability company, ,

    Claimant,

vs.

BLOCK F INVESTORS, LLC, an Arizona limited liability company; and THE GADSDEN COMPANY, LLC, an Arizona limited liability company ,

    Defendant.

THE GADSDEN COMPANY, LLC, an Arizona limited liability company,

    Counterclaimant,

vs.

AWS OPPORTUNITY FUNDS I, LLC, an Arizona limited liability company,

    Counterdefendant.

**AMENDED FINAL ARBITRATION AWARD**

(Richard K. Mahrle, Arbitrator )

Claimant, AWS Opportunity Funds I, LLC ("AWS"), made a cash capital contribution to Block F Investors, LLC ( "Block F"). The managing member of Block F is The Gadsden Company, LLC ("Gadsden") (Exhibit 3)[1] Block F and Gadsden are Respondents.

---

[1] Exhibit references are to the exhibits as marked at the evidentiary hearing

7123.15.3927013.1

WEINSTEIN_000263

1    AWS brought this action based on numerous legal theories. Gadsden filed a
2    counterclaim, but withdrew the counterclaim following the conclusion of the evidentiary
3    hearing.

**Factual Findings**

5    The testimony and exhibits received during the evidentiary hearing conducted on
6    May 15-17, 2024, support the factual findings set forth herein.

7    Adam Weinstein and Gerald Dixon are the members and managers of Gadsden.
8    (Exhibit 4)  In December 2021, Weinstein and Dixon approached Kelly Sands about
9    investing in the development and construction of an apartment complex in Tucson.
10   Sands was already an investor in another project in the same area that was also being
11   built through a limited liability company controlled by Weinstein and Dixon.

12   Sands was interested in the investment, at least in part, because the subject real
13   property, also referred to as Block F, was located in a designated Qualified Opportunity
14   Zone. If structured properly, Sands would be able to defer paying capital gains taxes on
15   profits he had made on other projects by investing those capital gains into a construction
16   project in a Qualified Opportunity Zone.

17   The proposal submitted to Sands by Weinstein (Exhibit 1) included the creation of
18   a "50-50 Joint Venture" and the use of the opportunity zone program. Sands was also
19   provided with some preliminary schematics and a development pro forma. (Exhibit 1)

20   Sands created AWS to be a member of the newly formed Block F, LLC.
21   Weinstein and Dixon used their already established limited liability company, Gadsden,
22   to become the other member and manager of Block F. An Operating Agreement for
23   Block F dated January 11, 2022, was signed on behalf of the respective entities.
24   (Exhibit 3)

25   Exhibit A to the Operating Agreement called for AWS to make a $3,375,286
26   capital contribution for 100 units which was represented to be a 50% interest. Gadsden's
27   capital contribution was described as " The Land" having an agreed upon value of
28   $2,310,000, plus a future cash contribution of $1,065,286. This would also entitle

1. Gadsden to 100 units and a 50% interest. The failure of Gadsden to make the cash contribution would result in a redistribution of units. *(Id.)*

The cash amounts selected were related to the funds needed to start the apartment construction and obtain the needed financing. (See Exhibit 1)

Essentially, none of the funds provided by AWS to Block F were used to develop the apartment project.

While the real property was put into Block F's name, Gadsden used part of the AWS capital contribution to pay off the lien on the real property so that it could be contributed to Block F free of liens.

Immediately after AWS made its capital contribution, Gadsden, in its role as manager, started transferring money out of Block F to Gadsden. By about three months later, Gadsden had depleted all of the funds except for about $49,000. (Exhibits 5, 6, and 7)

The evidence clearly shows that Gadsden had serious financial difficulties by January 2022 and needed funds to pay off, or refinance, loans it had taken out from CDFI. Those loans were personally guaranteed by Weinstein and Dixon. There was also a large unpaid balance on an American Express card. (Exhibits 17-19) Most of the American Express charges were personal in nature and in no way benefitted Block F. *(Id.)*

While Block F characterized these transfers as loans in Block F's records, no promissory notes were prepared and signed until after the Pima County Superior Court ordered Block F to make its financial records available to AWS. (Testimony of Jason Sprowls)

These actions by Gadsden violated the terms of the Operating Agreement. The following terms are material to this dispute:

> 1.3   <u>Purpose.</u> The purposes and scope of the Company's activities are strictly limited to directly or indirectly, own the Land, construct the Project and related improvements on the Land, and to lease, sublease, maintain, own, operate, manage, finance, refinance,

mortgage, hold, sell, reposition, exchange and otherwise deal in and with the Land as improved by the Project and engage in any other lawful activities determined by the Manager, with member consent if required by this Agreement, to be necessary or advisable in furtherance of the foregoing activities. The Company shall be operated at all times so as to qualify as a Qualified Opportunity Zone Business. The Company shall not engage in any business, and it shall have no purpose unrelated to the foregoing purposes and shall not acquire any real property or own assets other than those consistent with the Company's status as a Qualified Opportunity Zone Business.

* * *

**"Cause"** means any act or omission constituting bad faith, fraud, gross negligence, reckless or willful misconduct, or intentional misappropriation of funds of the Company or a Company subsidiary as determined pursuant to a binding determination under the arbitration provision set forth in Section 11.12 (c).

* * *

3.7   Member Loans. In the event that monies are required from time to time for the Company to meet the costs, expenses, obligations, liabilities and other charges arising out of the Company's business, the Manager shall cause such monies to be withdrawn from the Company bank accounts and used to discharge such costs, expenses, obligations, liabilities, or charges. In the event the funds available in said accounts shall at any time be insufficient to meet such costs, expenses, obligations, liabilities, and charges then the Manager may arrange to borrow funds as may be necessary therefor, the Manager may cause the Company to borrow such funds in such amounts as the Manager determines ("Member Loans").

* * *

5.3   Certain Powers of the Manager. Without limiting the generality of Section 5.1, and further provided the requirements of Section 5.4 are satisfied if applicable, the Manager shall have all power and authority to take action or execute documents on behalf of the Company, including but not limited to power and authority to do any of the following:

* * *

WEINSTEIN_000266

(c) make or incur any payment, expenditure or obligation or engaging in any transaction on behalf of the Company that is not provided for in the Budget not in excess of $75,000;

* * *

(g) invest Company funds temporarily, to the extent not required to pay the current expenses of the Company, in cash or money markets funds with a federal banking institution with at least $100 billion in assets;

(h) to the extent not provided for in the Budget and the same is not in excess of $75,000, execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, loan agreements, mortgages, deeds of trust, security agreements, pledge agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company's property, assignments, bills of sale, leases, and any other instruments or documents necessary, in the opinion of the Manager, to accomplish the purposes of the Company;

* * *

(j) enter into any agreement on behalf of the Company, so long as such agreement provides total consideration of $75,000 or less if the same is not already included in the Budget for the Company; and . . .

* * *

5.11 <u>Access to Books and Records.</u> Upon written request to the Manager, each Member shall have the right, during normal business hours, to inspect and copy, at the Member's expense, the Company's books and records. Each Member shall be provided, without request and on a monthly basis, statements of profits and losses, bank reconciliations, statements of cash flows and balance sheets of the Company. Each Member shall be provided, without request and on an annual basis, statements of profits and losses, statements of cash flows and balance sheets of the Company compiled by the Company's certified public accounting firm, which initially shall be Beach Fleischman, P.C., together with the Company's Federal and state income tax returns, as filed, including all schedules (including Schedule K-1), attachments and other submissions.

* * *

WEINSTEIN_000267

9.1 **Duties of Good Faith and Fair Dealing.** Each Member and each Manager shall act in good faith and shall deal fairly with the Company, each other Member, and each Manager.

9.2 **Duty of Care.** Each Manager shall exercise the care that an ordinarily prudent person would exercise under similar circumstances; provided, however, that if a Manager has special expertise, then that Manager shall exercise the same care that a third-party possessing comparable expertise would exercise. To the fullest extent permitted by applicable law, each Member waives all fiduciary duties that the other Member may owe it.

9.3 **Duty in Doing Business with the Company.** Other than such business arrangements which are expressly authorized by this Agreement, including but not limited to any Development Agreement entered into between the Company and The Gadsden Company, L.L.C. with the Members' approval under Section 5.4, all Members and Manager(s) may engage in business with the Company in a capacity other than as a Member or Manager only with the affirmative vote of the disinterested Members who represent at least a Majority of the Units entitled to vote on such matter. The terms of any business arrangement permitted under this Section 9.3 shall be arm's-length terms.

\* \* \*

9.5 **Duty to Keep Other Members Informed.** Each Manager shall use reasonable efforts to keep all Members and each Manager currently informed concerning the Company's business and operations.

\* \* \*

Article 11.12(c)   **Special Process to Determine Cause.** All disputes between the Parties arising out of or related to the determination of Cause under this Agreement shall be resolved by binding arbitration within the State of Arizona . . . Any arbitration shall be conducted in accordance with A.R.S. § 12-3001 et seq.. Any arbitration award shall be enforced by judgment entered in the Superior Court of the State of Arizona.

(d) **Attorneys Fees.** In the event of mediation or arbitration, each party shall bear its own fees and costs. In the event of litigation, arising

WEINSTEIN_000268

out of or relating to this Agreement, the non-prevailing party shall reimburse the prevailing party for its costs and expenses (including, but not limited to, reasonable attorneys' fees and costs) incurred in connection with such litigation.

### Scope of the Arbitrator's Authority

This matter has proceeded through the arbitration process pursuant to a restrained arbitration provision contained in the Block F Operating Agreement. (Exhibit 3) (the "Operating Agreement") Article 11.12(c) of the Operating Agreement provides:

> (c) Special Process to Determine Cause. All disputes between the Parties arising out of or related to the determination of Cause under this Agreement shall be resolved by binding arbitration within the State of Arizona. . . .

"Cause" is defined in Article 2 as:

> "**Cause**" means any act or omission constituting bad faith, fraud, gross negligence, reckless or willful misconduct, or intentional misappropriation of funds of the Company or a Company subsidiary as determined pursuant to a binding determination under the arbitration provision set forth in Section 11.12(c).

An arbitrator can only act under the authority granted to the arbitrator as specified in the contract. *Moseley v. Brewer,* 139 Ariz. 540, 541 (App. 1984); *Goldsberry v. Hohn,* 120 Ariz., 40, 44 (App. 1978)

The arbitration provision at Section 11.12 (c) places into the Arbitrator's hands the determination of whether Gadsden has committed any act of "bad faith, fraud,… reckless or willful misconduct, or intentional misappropriation of funds of the Company…" Therefore, the Arbitrator is entitled to make findings on those issues.

### Findings of Cause

The evidence presented at the hearing fully supports, by clear and convincing evidence, that Gadsden, through Weinstein and Dixon, committed acts constituting bad faith, fraud, willful misconduct, and intentional misappropriation of funds.

### 1)  The Capital Contribution

AWS put in its cash. Gadsden put in the real property, but only after using AWS' money to satisfy the lien on the real property. (Exhibit 27)  This was an unauthorized use of Block F's funds.  Operating Agreement Articles 5.3(c), (g) and (j); Articles 9.1, 9.2, and 9.3.  There was no agreement that allowed the use of Block F funds to free up the subject property.  What occurred here is akin to Block F buying the Land with the AWS money.  As a result, Gadsden did not contribute the Land to Block F at all.  Essentially, Gadsden made no capital contribution to Block F.

### 2)  Fraud

AWS has proven by clear and convincing evidence that Gadsden, acting through Weinstein and Dixon, committed acts of fraud.

Gadsden falsely represented that Block F would be a 50-50 joint venture, that it would contribute the land free and clear so as to actually have its stated value, and that AWS' funds would be used to develop the project (See Article 1.3 of the Operating Agreement).  There was no evidence submitted that even had a tendency to show that AWS knew these statements were untrue.  The evidence shows that the representations were made with the intent that AWS act in reliance on the truth of the representations. AWS had the right to rely and was damaged as a result. *E.g., Dillon v. Zeneca Corp.*, 202 Ariz. 167, 172 (App. 2002).

There are also numerous badges of fraud present here. *E.g., Carey v. Soucy,* 245 Ariz. 547, 553 (App. 2018).  These include the failure to keep AWS informed (Article 9.5), the failure to provide AWS with access to books and records as required by Article 5.11 of the Operating Agreement, and the late prepared unsecured promissory notes with a non-commercial interest rates some of which were later falsely designated as partially paid, or paid in full (Exhibits 87, 127 and 128).

///

///

///

7123.15.3927013.1                                         8

WEINSTEIN_000270

### 3) Willful Misconduct

The actions of Gadsden through Weinstein and Dixon in depleting AWS' capital contribution, then covering it up, were willful acts. No other conclusion is possible.

### 4) Intentional Misappropriation of Funds

Gadsden, as the manager of Block F, intentionally diverted the funds contributed by AWS to the benefit of Gadsden, Weinstein and Dixon.

The purpose of Block F is spelled out in Article 1.3 of the Operating Agreement. This article says the "Company's activities are strictly limited to directly or indirectly, own the Land, construct the Project and related improvements on the Land…"

That is not what happened. Instead, all of AWS' funds benefited Gadsden, Weinstein, and Dixon. These funds were misappropriated.

### Damages Recoverable

Due to the limitations on the arbitration as controlled by Article 11.12(c), it is not clear how these findings related to Cause are to be translated into applicable legal theories and damages. As briefed by the parties, the legal theories being pursued by AWS, while fitting into the Cause designations, are not necessarily legally viable due to various issues being raised, such as the economic loss rule.

### A.  Breach of the Implied Covenant of Good Faith and Fair Dealing

AWS has pled this count under contract. The parties have both cited *Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons*, 201 Ariz. 474 (2002) (hereinafter *Wells Fargo*) for the elements of this claim. The standard formulation of the implied covenant is:

> The implied covenant of good faith and fair dealing prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement.
>
> *Wells Fargo*, 201 Ariz. at 490 (citing *Rawlings v. Apodaca*, 151 Ariz. 149, 153-154 (1986)

WEINSTEIN_000271

Here, Gadsden took numerous actions that prevented AWS from receiving the benefits and entitlements of the agreement. By misappropriating AWS' capital contribution and using those funds for purposes unrelated to the development of the apartment complex on the Block F property, Gadsden breached the covenant of good faith and dealing. Even though Gadsden booked many of the fund transfers to Gadsden as loans, the loans were made in violation of Articles 3.7, 5.3(c) (g) and (h) of the Operating Agreement. (Exhibit 3) While the loans were later documented through promissory notes, the loans were made to an insolvent entity, were unsecured, not personally guaranteed, and had a commercially unreasonable rate of interest. (See Exhibit 63) Gadsden then later asserted that one of the notes had been paid in full, claiming that the value of the real property placed into Block F somehow represented payment of the notes. (Exhibits 87, 127)

There is no question that these actions all prevented AWS from receiving the benefits and entitlements of the agreement and therefore AWS' claim for breach of the covenant of good faith and fair dealing is sustained.

**B.     Fraud and the Economic Loss Rule.**

The Arbitrator has already found that Gadsden committed acts constituting fraud. As part of its response to the fraud claim, Gadsden asserts that the fraud claim is not viable due to the economic loss rule. *E.g., Flagstaff Affordable Housing v. Design All, Inc.*, 223 Ariz. 320 (2010). Instead, Gadsden asserts that AWS is limited to pursuing contract based claims. Therefore, the issue to be resolved is whether the economic loss rule prevents AWS from being awarded tort damages for Gadsden's fraud.

AWS argues that Respondents have waived the issue of the economic loss rule because Respondents did not raise the doctrine as an affirmative defense until their prehearing brief. AWS also asserts that the Operating Agreement preserved its right to pursue a claim for tort due to the manner in which "Cause" is defined.

The case law cited by Respondents supports the proposition that the economic loss rule is not an affirmative defense that can be waived. No waiver occurred here.

As to whether the Operating Agreement preserved a right for AWS to obtain tort damages for purely economic loss is a much closer question. As addressed previously, the Arbitrator's authority encompasses determining "Cause" as defined in the Operating Agreement.

As the Court noted in *Sherman v. PremierGarage Systems*, 2010 WL 3023320 (D. Ariz. 2010), "the scope of the economic loss doctrine in Arizona is by no means settled." It requires a balancing of interests. The "doctrine may vary in its application depending on context-specific policy considerations." *Flagstaff*, 223 Ariz. at 325. Whether the economic loss rule applies requires the consideration of the policies underlying tort and contract law. *Id*.

The Arbitrator holds that the economic loss rule does not preclude AWS from pursuing its fraud-based claim. In doing so, the Arbitrator adopts the reasoning of the District Court of Arizona found in *Barrett-Jackson Auction v. Mountain Sports Intern'l*, 2020 WL 9349176 (D. Az. 2020).

That ruling emphasized the narrower approach to the economic loss doctrine as applied in Arizona citing *Sullivan v. Pulte Home Corp.*, 232 Ariz. 344 (2013). The Court noted that the Arizona Supreme Court has never found that the doctrine applied to fraudulent inducement, or negligent misrepresentation.

The District Court also distinguished *Cook v. Orkin Exterminating*, 227 Ariz. 331 (App. 2011) pointing to *Shaw v. CTVT Motors, Inc.*, 232 Ariz. 30 (App., 2013) which noted:

> Even though the Cooks asserted a fraudulent inducement claim, we did not explicitly address the viability of a claim for fraudulent inducement under the economic loss rule in that case.

232 Ariz. at 32

The District Court went on to note that:

> If the primary function of the doctrine is " to encourage private ordering of economic relationships and to uphold the expectations of the parties," then certainly it would seem

WEINSTEIN_000273

> inapposite to hold innocent parties to limited contractual remedies when those contractual remedies were based on intentional misrepresentations made by the other party. *See Flagstaff,* 223 P.3d at 67.
>
> 2020 WL at 9349178

The District Court then provided a long line of Arizona cases where courts refused to extend the economic loss rule to fraud or negligent misrepresentation claims.

Therefore, based on the reasoning of *Barrett-Jackson* and the terms of the arbitration provision that allows for the Arbitrator to deal with findings related to fraud, AWS can pursue its fraud in the inducement claim. As stated previous, Gadsden committed fraud in the inducement.

### C.   Negligent Misrepresentation

As set forth herein, Gadsden committed actual fraud and misappropriation of funds. There was no negligence involved here. This claim is subsumed into the fraud claim.

### D.   Fraudulent Transfers

AWS' fraudulent transfer claim is not supported because AWS does not fit the definition of a creditor. If there is a creditor here that has a fraudulent transfer claim, it is Block F as a creditor of Gadsden. A.R.S. § 44-1001(3).

Furthermore, if relief was available to AWS on this statutory claim, it would be essentially the same relief available under the breach of the covenant of good faith and fair dealing.

### E.   Conversion

The elements of conversion are all present here. Gadsden has intentionally exercised dominion and control over the funds paid into Block F by AWS in a manner that seriously interferes with the rights of Block F to the funds. *Miller v. Hehlen,* 209 Ariz. 462, 472 (App. 2005). The fact that we are dealing here with money is not disqualifying because the funds can be described, identified and segregated. *Autoville, Inc. v. Friedman,* 20 Ariz. App. 89, 91 (1973).

WEINSTEIN_000274

However, it is Block F that is entitled to immediate possession of the converted funds, not AWS. *See Universal Mktg. & Ent., Inc. v. Bank One of Arizona*, 203 Ariz. 266 (App. 2002). This does not mean that AWS is not entitled to its damages arising from Gadsden's breach of the covenant of good faith and fair dealing, or its fraud claims.

**F.     Unjust Enrichment**

Because the Operating Agreement governs the relationship of the parties, a claim for unjust enrichment is not available. *Trustmark Inc. Co. v. Bank One Arizona, NA*, 202 Ariz. 535 (App. 2002); *Brooks v. Valley Nat'l Bank*, 113 Ariz. 169, 174 (1976).

**G.     Promissory Estoppel**

Because the parties' relationship is controlled by the Operating Agreement, this cause of action which was pled by AWS in the alternative, is not available. *Johnson Int'l, Inc. v. City of Phoenix*, 192 Ariz. 466 (App. 1998).

### Addition of Contract Claim

AWS has asked that it be allowed to amend its claims to include an express breach of contract claim. The Arbitrator is not going to entertain this proposed amendment to conform to the evidence because it is not clear from the arbitration provision in the Operating Agreement that the Arbitrator has the authority to rule on a direct breach of contract claim. The arbitration provision is clear that the Arbitrator can address bad faith-based claims.

### Damages

As outlined above, AWS has met its burden of proof on its claim for breach of the covenant of good faith and fair dealing. The next issue is what damages are awardable to AWS on that claim. AWS is entitled to an Award in the amount of $3,375,286 plus interest at the Arizona statutory rate starting February 1, 2022, until paid in full. These damages are awarded under both the breach of the covenant of good faith and fair dealing and the fraud claims.

AWS has also asked for what it calls expectancy damages. The Arbitrator finds that expected earnings from the eventual construction of the apartment complex are too

speculative to be awarded. *Schuldes v. Nat'l Sur Corp.*, 27 Ariz.App. 611 (1976); *Rancho Pescado, Inc. v. Nw. Mut. Life Ins. Co.*, 140 Ariz. 174, 183 (App. 1984).

The evidence supports that AWS invested in the Block F project because it would provide the benefits that accompany building within a Qualified Opportunity Zone. AWS seeks $104,277 that Mr. Sands had to pay because of the failure of the project to qualify for Opportunity Zone status, and $134,806 for loss of use of the capital gains taxes it had to pay early.

Respondents raise several arguments as to why this relief is not available to AWS.

As the evidence showed, the parties here failed to qualify for Opportunity Zone tax treatment on both sides of the transaction. AWS was not established as an Opportunity Zone Fund. (Exhibit 86) As a result, even though Gadsden never took the steps it was required to perform in order to comply with the Opportunity Zone requirements, AWS' failure to properly organize as a fund would have precluded the anticipated tax break. (*Id.*)

While Gadsden breached the terms of the Operating Agreement by not delivering on the Opportunity Zone representation, even if Block F and Gadsden had done everything correctly, AWS' failures would have prevented the use of the tax benefit.

**Punitive Damages**

Under A.R.S. § 12-3021(A), if appropriate, an arbitrator is entitled to award punitive damages.

The actions of Gadsden were reprehensible. At a minimum there was deliberate interference with the rights of AWS. The harm caused here was severe and done in reckless disregard for the risk of harm. There was knowing misappropriation of funds by Gadsden that were used to bail out Gadsden and its members. *E.g., Sobieski v. American Standard Ins. Co.*, 240 Ariz. 531 (App. 2016); *Thompson v. Better-Bilt Aluminum Prod. Co.*, 171 Ariz. 550 (1992).

The following acts support an award of punitive damages:

Gadsden started to use the AWS capital contribution almost immediately to pay-off loans made by other entities related to Gadsden, Weinstein, and Dixon. The AWS funds were also used to pay off American Express Card charges which were mostly personal to Weinstein and did not benefit Block F in any way.

Gadsden used AWS funds to essentially buy the Block F property that was transferred into the LLC, whereby it did not, in fact, contribute the value of the property to the LLC. The evidence fully supports that from the beginning Gadsden had no intention to actually develop the apartment complex, and instead entirely crippled Block F's ability to do anything to move the project forward.

Gadsden even went so far as to pilfer the proceeds of a monthly parking rental payment. Those funds were supposed to be used to pay the real property tax due on Block F, but Gadsden failed to do so.

Gadsden also took steps to hide its wrongdoing from AWS. Gadsden failed to provide the periodic reports as required under the Operating Agreement. It then refused AWS access to the Block F financial records even though such access is mandated under the Operating Agreement and by statute.

AWS is awarded $1 million in punitive damages against Gadsden.

### Attorneys' Fees

AWS acknowledges that the Operating Agreement provides that in the event of an arbitration, each party is required to bear its own costs and attorneys' fees. (Exhibit 3, Article 11.2(d))

AWS argues that to get around that provision the Arbitrator can and should award attorneys' fees as a sanction under A.R.S. § 12-349(A)(1)

As stated previously, the Arbitrator's authority is limited to the terms set forth in the arbitration provision. The limitation on awarding attorneys' fees and costs is found in the same Article of the Operating Agreement as the arbitration provision. As a result, the Arbitrator does not have the authority to award attorneys' fees, costs, or allocate between the parties Arbitration fees.

## CONCLUSION

AWS is awarded $3,375,286.00 plus interest at the Arizona statutory rate from February 1, 2022 until paid in full against The Gadsden Company, LLC, and Block F Investors LLC jointly and severally on AWS's breach of the covenant of good faith and fair dealing and against The Gadsden Company, LLC, solely on AWS fraud claim. AWS is also awarded $1 million in punitive damages against The Gadsden Company, LLC plus interest thereon at the Arizona statutory rate from the date this award is entered until paid in full.

This Award is in full settlement of all claims submitted in the Arbitration. All claims not expressly granted herein are hereby denied.

DATED this 8th day of July 2024.

*Richard K. Mahrle*
RICHARD K. MAHRLE
Arbitrator