Exhibit D

FILED
Gary L. Harrison
CLERK, SUPERIOR COURT
11/14/2023 10:00:09 AM
BY: ALAN WALKER /s/
DEPUTY
Case No. C20235367
HON. CASEY F MCGINLEY

1    DORSEY & WHITNEY LLP
     2325 East Camelback Road, Suite 300
2    Phoenix, AZ 85016
     Telephone: (602) 735-2700
3

4    Isaac M. Gabriel, Esq. (#021780)
     gabriel.isaac@dorsey.com
5    Alissa Brice Castaneda, Esq. (#027949)
     castaneda.alissa@dorsey.com
6    Julie P. Ibrahim, Esq. (#036294)
     ibrahim.julie@dorsey.com

7    *Attorneys for Plaintiff*

8         **IN THE SUPERIOR COURT FOR THE STATE OF ARIZONA**

9              **IN AND FOR THE COUNTY OF PIMA**

10

| | |
|---|---|
| 11   IB NEW VENTURES, LLC, an Arizona limited liability company | Case No. _____ |
| 12         Plaintiff, | |
| 13     vs. | **VERIFIED COMPLAINT** |
| 14   MONIER INVESTORS MEMBER, LLC, an Arizona limited liability company; GERALD J. DIXON and MARJORIE A. DIXON, husband and wife; ADAM WEINSTEIN and KIRA DIXON-WEINSTEIN, husband and wife; HOLUALOA COMPANIES, LLC, an Arizona limited liability company; MISSION DISTRICT PARTNERS, LLC, an Arizona limited liability company | **(Breach of Contract; Breach of Fiduciary Duty; Breach of Implied Covenant of Good Faith and Fair Dealing; Fraudulent Misrepresentation; Negligent Misrepresentation; Constructive Fraud)** |
| 19         Defendants. | |

20

21       Plaintiff, IB NEW VENTURES, LLC ("<u>IBNV</u>"), for its Complaint against

22   Defendants, complains and alleges as follows:

23                               **<u>PARTIES</u>**

24       1.     IBNV is an Arizona limited liability company, whose principal place of

25   business is in Maricopa County, Arizona.

26

2.      Defendant MONIER INVESTORS MEMBER, LLC is an Arizona limited liability company ("Monier") whose principal place of business is in Pima County, Arizona.

3.      Defendant GERALD J. DIXON ("Mr. Dixon") is a natural person, who, upon information and belief, resides in the State of Arizona.  Mr. Dixon is also a manager of Monier.

4.      Defendant MARJORIE A. DIXON ("Mrs. Dixon") is a natural person, who, upon information and belief, resides in the State of Arizona.  Mrs. Dixon is, upon information and belief, married to Mr. Dixon.

5.      Defendant ADAM WEINSTEIN ("Mr. Weinstein") is a natural person, who, upon information and belief, resides in the State of Arizona.  Mr. Weinstein is also a manager of Monier.

6.      Defendant KIRA DIXON-WEINSTEIN ("Mrs. Weinstein") is a natural person, who, upon information and belief, resides in the State of Arizona.  Mrs. Weinstein is, upon information and belief, married to Mr. Weinstein.

7.      Defendant HOLUALOA COMPANIES, LLC is an Arizona limited liability company ("Holualoa") whose principal place of business is in Pima County, Arizona.

8.      Defendant MISSION DISTRICT PARTNERS, LLC is an Arizona limited liability company ("Mission District") whose principal place of business is in Pima County, Arizona.

9.      At all relevant times, Mr. Dixon, Mr. Weinstein, Mrs. Dixon, and Mrs. Weinstein were the legal and/or beneficial owners of, controllers of, or affiliates of Monier.

**JURISDICTION AND VENUE**

10.      The Court has subject matter jurisdiction over this case pursuant to the Arizona Constitution and A.R.S. § 12-123.

11.     The Court has personal jurisdiction over Defendants because (i) they reside and/or are headquartered in and conduct business in Pima County, Arizona, (ii) the Project (defined below) is in Pima County, and (iii) they caused events to occur in Pima County, Arizona out of which this action arises.

12.     Venue in Pima County, Arizona is proper pursuant to A.R.S. § 12-401.

**LETTER OF CREDIT AND GUARANTY**

13.     IBNV is a member of Monier, previously holding a 20.1% interest.

14.     Monier is in the business of constructing, owning and operating a market-rate housing apartment complex, known as the "Monier Apartments," south of "Mercado San Agustin," located in or near downtown Tucson, Arizona (the "Project").[1]

15.     Pursuant to Section 5.1.D(i) of that certain *Third Amended and Restated Operating Agreement of Monier Investors Member, LLC* (the "Operating Agreement") dated as of August 1, 2018, IBNV provided initial operating deficit and working capital reserve letters of credit Monier in the amount of $2,232,515.00 (the "IBNV LOC") pursuant to the terms and conditions of that certain Term Sheet by and among IBNV, Mr. Dixon and Mr. Weinstein dated on or about May 18, 2018 (the "Term Sheet"). A complete and authentic copy of the Operating Agreement is attached hereto as **Exhibit A** and is incorporated herein by this reference. A complete and authentic copy of the Term Sheet is attached hereto as **Exhibit B** and is incorporated herein by this reference.

16.     Section 5.1.D(i) of the Operating Agreement further provides that "To the extent the IBNV LOC is drawn upon, the amount drawn will be deemed a loan from IBNV to Monier that will bear interest at twelve percent (12%) per annum ***payable monthly*** (the "IBNV LOC Loan")."

---

[1]     The title to the Project is held by Monier Investor, LLC, which is 100% owned and managed by Monier.  The Project is a HUD affordable housing project and the HUD rules and regulations require the Project to be held in single purpose, single member, entity.

17.    The Term Sheet provides a monthly late fee of 3% of all past due interest amounts on the IBNV LOC Loan.

18.    The Operating Agreement provides a priority payment for the IBNV LOC Loan, stating, "Repayment of the amount drawn upon the IBNV LOC … will be required before any other Capital Account repayment or Distributions are paid to any other Member."

19.    Section 5.1.D(i) of the Operating Agreement further provides that Dixon, Weinstein, Mrs. Dixon and Mrs. Weinstein "will personally guaranty repayment of any draws against the IBNV LOC and will repay or cause [Monier Investors, L.L.C.] to repay the LOC draws as soon as reasonably possible."

20.    Section 7.10 of the Operating Agreement provides that "proper and complete books of account of Monier's business will be kept by the Managers at the office of Monier *and will be open to inspection by each Member and/or his, her or its authorized representatives during normal business hours*." (emphasis added).

21.    Section 7.12 of the Operating Agreement provides that "Managers will be required to provide all Members with a bi-weekly update on the status of the Business and the progress of [Monier Investors, L.L.C.] which must include reporting on the HUD-5372 Progress Schedule."

22.    Section 7.1.C of the Operating Agreement provides that "failure of the Mangers to provide bi-weekly reporting as required by Section 7.12" constitutes an "Event of Default" giving IBNV the right "to take over as sole Manager of [Monier] and [Monier Investors, L.L.C.]."

23.    The Operating Agreement is executed personally by each of Mr. Dixon, Mr. Weinstein, Mrs. Dixon and Mrs. Weinstein.

24. Other than a few initial payments, Monier failed to make the monthly interest payments due to IBNV as required on the Operating Agreement, thereby breaching its payment obligations owing to IBNV.

25. As of April 1, 2023, at least the following amounts were owing on the IBNV LOC Loan:

| | |
|---|---|
| Principal: | $1,936,262.94 |
| Interest: | $ 443,346.90 |
| Late Fees: | $ 132,759.61 |
| Renewal Fees: | $   46,401.50 |
| **Total:** | **$2,558,770.95** |

26. As of April 1, 2023, outstanding interest and late fees on the IBNV LOC Loan totaled $576,106.51 (the "IBNV LOC Past Due Balance").

27. In addition to the foregoing amounts, IBNV is entitled to accruing interest, late fees, renewal fees, and all of its attorneys' fees and costs.

## NOTE AND GUARANTY

28. On or about May 24, 2021, IBNV made a loan and other financial accommodations (the "Completion Loan") to Monier.

29. The Completion Loan is evidenced by, among other documents and instruments: (i) that certain *Multiple Advance Promissory Note,* dated as of May 24, 2021 (as amended, modified, or extended from time to time, the "Note" and together with the documents or instruments which evidence or secure the Completion Loan, including the below defined Guaranty, the "Completion Loan Documents"), made by Monier in favor of IBNV in the original principal amount of $1,100,000.00. A complete and authentic copy of the Note is attached hereto as **Exhibit C** and is incorporated herein by this reference.

30. In conjunction with the Completion Loan, Mr. Dixon, Mr. Weinstein, Mrs. Dixon and Mrs. Weinstein each executed that certain *Guaranty*, dated as of May 24, 2021 (as amended or modified from time to time, the "Guaranty"), in favor of IBNV. A

complete and authentic copy of the Guaranty is attached hereto as **Exhibit D** and is incorporated herein by this reference.

31.     As of April 1, 2023, the outstanding balance of the Completion Loan was at least $1,321,953.76, including principal of $1,100,000.00 and accrued interest of $221,953.76, plus all attorneys' fees and costs incurred by IBNV (collectively, the "Note Indebtedness").

32.     Pursuant to Section 2 of the Note, "Principal and interest shall be payable on demand."

33.     Pursuant to Section 1 of the Guaranty, each of Mr. Dixon, Mr. Weinstein, Mrs. Dixon and Mrs. Weinstein unconditionally guaranteed full and prompt payment of all amounts due under the Note and prompt performance by Monier of all obligations under the Note.

## PAYMENT DEMAND AND DEFAULT

34.     By letter dated April 7, 2023 (the "Note Demand Letter"), IBNV made demand under the Note, thereby causing all amounts owing thereunder to be immediately due and payable.

35.     In the Note Demand Letter, and pursuant to the terms of the Note, IBNV notified Monier and Mr. Dixon, Mr. Weinstein, Mrs. Dixon, and Mrs. Weinstein that additional interest at the default rate would begin accruing on April 8, 2023 if the Note Indebtedness was not immediately paid.

36.     In addition, IBNV demanded that Monier and Mr. Dixon, Mr. Weinstein, Mrs. Dixon, and Mrs. Weinstein pay the Note Indebtedness no later than April 13, 2023 (the "Note Payment Deadline"), or IBNV would proceed with exercising its rights and remedies. A complete and authentic copy of the Note Demand Letter is attached hereto as **Exhibit E** and is incorporated herein by this reference.

4896-1686-7715\5

37.     Separately, by letter dated April 11, 2023 (the "LOC Demand Letter"), IBNV demanded that Monier and Mr. Dixon, Mr. Weinstein, Mrs. Dixon, and Mrs. Weinstein pay the IBNV LOC Past Due Balance on or before 1:00 p.m. Arizona time on April 14, 2023 (the "LOC Payment Deadline"). A complete and authentic copy of the LOC Demand Letter is attached hereto as **Exhibit F** and is incorporated herein by this reference.

38.     Monier and Mr. Dixon, Mr. Weinstein, Mrs. Dixon, and Mrs. Weinstein failed and/or refused to pay the Note Indebtedness and the IBNV LOC Past Due Balance on or before the Note Payment Deadline and/or the LOC Payment Deadline, as applicable, as required by the LOC Demand Letter, Note Demand Letter, Operating Agreement, Note and Guaranty.

39.     IBNV is entitled to all applicable late charges, attorneys' fees and costs, and all other amounts chargeable under the Completion Loan Documents and Operating Agreement or applicable law. In addition, IBNV is entitled to its attorneys' fees and costs pursuant to A.R.S. §§ 12-341 and 12-341.01.

40.     On or about April 24, 2023, IBNV initiated a lawsuit, Maricopa County Superior Court Case No. CV2023-006177 (the "Maricopa County Lawsuit"), to recover the IBNV LOC Loan Past Due Balance and the Note Indebtedness.

41.     On or about September 1, 2023, several months after the Maricopa County Lawsuit was filed, Monier requested an updated payoff amount from IBNV.

42.     On September 5, 2023, counsel for IBNV provided payoff amounts with per diem interest rates as follows:

LOC Loan:
Principal:              $1,936,262.94
Interest (thru 9/5):    $497,732.10
Late Fees:              $190,367.94
Renewal Fees:           $46,401.50

-7-

**Total:**             **$2,670,764.48  (plus  attorneys'
fees and costs, set forth below)**
*Per diem interest from and including 9/6 = $636.58*

Completion Loan:
Principal:          $1,100,000.00
Interest (thru 9/5):   $353,170.20  (of  this  amount,
$45,506.85 is the extra 10% default interest)
**Total:**             **$1,453,170.20  (plus  attorneys'
fees and costs, set forth below)**
*Per diem interest from and including 9/6 = $843.84*

Atty's fees and Costs through 9/5: $164,503.18

**Grand total as of 9/5/2023 = $4,288,437.86, plus per
diem interest as noted above**

43.     By letter dated September 12, 2023 (the "HREF Closing Letter"), Monier notified IBNV that Monier pursued and closed a deal with Hudson Real Estate Finance ("HREF") to "refinance [Monier's] various debts" and that Monier would wire $3,897,528.18 to IBNV (the "Partial Payoff") in satisfaction of principal and interest in the IBNV LOC Loan and Completion Loan.  Monier made it clear, however, that it would not be wiring any amount to satisfy outstanding late fees, renewal fees, or attorneys' fees/costs owed to IBNV. A true and correct copy of the HREF Closing Letter is attached hereto as **Exhibit G**.

44.     On or about September 18, 2023, IBNV received a wire for the Partial Payoff.

45.     Applicable late charges, attorneys' fees and costs, and other amounts chargeable under the Completion Loan Documents and Operating Agreement remain outstanding.

46.     The Maricopa County Lawsuit remains pending today as to such unpaid amounts.

4896-1686-7715\5

1      **REPORTING/BOOKS AND RECORDS DEFAULTS**

2          47.    Monier never provided the bi-weekly reports to IBNV required under

3     Section 7.12 of the Operating Agreement.

4          48.    Pursuant to Section 7.1.C of the Operating Agreement, failure to provide bi-

5     weekly reports is an "Event of Default" giving IBNV the right to take over as sole

6     Manager of Monier and Monier Investors, L.L.C.

7          49.    In late March, 2023, IBNV had a discussion with Monier's managers, Mr.

8     Weinstein and Mr. Dixon, about the status of the Project and requested financial

9     information, as permitted under the Operating Agreement.

10         50.    The managers orally agreed to provide such reporting.

11         51.    Following such discussion, on March 27, 2023, IBNV sent an email

12    requesting various financial reports and information.

13         52.    On March 28, 2023, Monier responded that it would not provide the

14    information requested if there was a claim that Monier was in breach of the Operating

15    Agreement.  A complete and authentic copy of the March 27-28, 2023 emails are attached

16    hereto as **Exhibit H** and are incorporated herein by this reference.

17         53.    Thereafter, on March 31, 2023, Monier's attorney sent a letter claiming

18    (wrongly) that IBNV was not entitled to the records requested.  A complete and authentic

19    copy of the March 31, 2023 letter is attached hereto as **Exhibit I** and is incorporated

20    herein by this reference.

21         54.    Accordingly, by letter dated April 7, 2023 (the "Record Inspection Letter"),

22    IBNV demanded access to Monier's books and records (including in native format) and

23    provided 12 days' advance notice to Monier, with the inspection and copying to occur at

24    9:00 a.m. on April 19, 2023 (i.e., during normal business hours).  A complete and

25    authentic copy of the Record Inspection Letter is attached hereto as **Exhibit J** and is

26    incorporated herein by this reference.

4896-1686-7715\5

55.     The Record Inspection Letter notified Monier that IBNV's authorized agent, Jason Sprowls ("Mr. Sprowls") would be present at Monier's office at 9:00 a.m. on April 19, 2023 for an inspection and copying of the books and records.

56.     The Record Inspection Letter provided specific categories of documents that IBNV sought to inspect and copy.

57.     Further, on April 14, 2023, IBNV's attorney, Isaac Gabriel ("Mr. Gabriel") sent a detailed email to Monier's attorney, William Fischbach ("Mr. Fischbach") seeking to (i) confirm the location of Monier's books and records prior to Mr. Sprowls' inspection and copying, and (ii) clarify the specific records sought so that they could be gathered in advance if needed. A complete and authentic copy of the April 14, 2023 email is attached hereto as **Exhibit K** and is incorporated herein by this reference.

58.     Mr. Fischbach did not immediately respond to Mr. Gabriel's April 14, 2023 email.

59.     By email dated April 18, 2023 (the "Sands Email"), IBNV's Manager, Allen Sands responded to a voicemail from Adam Weinstein and Jerry Dixon, members of Monier, further confirming Mr. Sprowls' inspection and copying for the following day, April 19, 2023.

60.     In response to the Sands Email, Mr. Fischbach emailed Mr. Gabriel on the afternoon of April 18, 2023, stating for the first time that Monier would not be able to accommodate Mr. Sprowls' inspection and copying the following day, but did not suggest any alternatives times that his client(s) are available.  A complete and authentic copy of the Sands Email and the April 18, 2023 emails between counsel are attached hereto as **Exhibit L** and are incorporated herein by this reference.

61.     In response, Mr. Gabriel offered to allow Monier to provide the requested records electronically before 5:00 p.m. on April 18, 2023, and otherwise reserved IBNV's rights to send Mr. Sprowls for the inspection and copying on April 19, 2023, as noticed in

1 IBNV's Record Inspection Letter on April 7, 2023. *See* **Exhibit L** attached hereto.

2   62. Mr. Fischbach did not offer to provide the records electronically.

3   63. Mr. Sprowls was present at Monier's office at 127 W. Franklin, Tucson,

4 Arizona (the "Office") at 9:00 a.m. on April 19, 2023 for an inspection and copying of the

5 books and records.

6   64. The Office was open for business and there were three other people working

7 there during the hour, a woman named Carla and two men. Carla told Mr. Sprowls she

8 was contacting Adam Weinstein.

9   65. Mr. Sprowls waited for an hour until Adam Weinstein called him and told

10 him that Monier had nothing for him to inspect or copy and that the "matter was in the

11 hands of the attorneys."

12   66. Mr. Sprowls asked Mr. Weinstein if there was another office he could go to

13 where there were Monier books and records and/or whether he could return later to

14 inspect and copy the books and records, and he said no.

15   67. Therefore, in violation of the clear contractual rights to inspection under the

16 Operating Agreement, and despite the fact that Monier had almost two weeks' notice to

17 make available for inspection and copying (either in person or electronically) the books

18 and records it maintains in the regular course of business, Monier willfully and

19 purposefully failed and refused to turn over any books and records to IBNV for inspection

20 and copying.

21   68. On or about May 5, 2023, in connection with the Maricopa County Lawsuit,

22 the Maricopa County Superior Court granted IBNV's request for preliminary injunctive

23 relief against Monier, which required Monier to make all of the books and records IBNV

24 sought to review available for inspection and copying on May 10-11, 2023. The order

25 granting such relief is attached hereto as **Exhibit M**.

26

4896-1686-7715\5

69.    An inspection of Monier's books and records took place on or about May 10, 2023 (the "Inspection").

70.    After the Inspection, IBNV, by and through counsel, made several follow up requests for books and records which were not made available at the Inspection. Certain supplemental records were provided, while others were not.

71.    Upon IBNV's initial review of Monier's books and records, IBNV identified numerous failures in management of Monier and defaults under the Operating Agreement and Term Sheet.

72.    By letter dated August 28, 2023, IBNV requested to inspect Monier's books and records again on September 7, 2023. A true and correct copy of IBNV's request is attached hereto as **Exhibit N**.

73.    By letter dated September 1, 2023, Monier refused such request, stating that its comptroller would be out of town until September 16, 2023 and unable to fulfill a books and records request. A true and correct copy of Monier's letter is attached hereto as **Exhibit O**.

74.    In reality, Monier denied IBNV's books and records inspection because it was working in secret to amend Monier's Operating Agreement without notice to IBNV, and Monier and its managers did not want IBNV to become aware of the transaction.

75.    By way of the HREF Closing Letter on September 12, 2023, Monier notified IBNV that it had amended the Operating Agreement on September 8, 2023 (the "Amended OA") – i.e., the day following IBNV's requested books and records inspection. A true and correct copy of the Amended OA is attached to the HREF Closing Letter attached above as Exhibit G.

76.    The Amended OA fundamentally alters the economics and control of the Monier, circumvents various provisions of the Operating Agreement which formerly benefitted and protected IBNV, and excuses various obligations of Monier and its

management that Monier and its managers previously failed to comply with.

77.    Specifically, the Amended OA makes HREF a new member of Monier in connection with an $8,000,000 loan to be obtained by Monier from HREF (the "HREF Loan").

78.    The Amended OA provides for preferred returns to HREF before returns are distributed to any other member, including IBNV. In other words, HREF must be repaid its entire $8,000,000, plus 14% interest, before any distributions can be made to other members, including IBNV.

79.    The HREF Loan and Amended OA are a result of Mr. Dixon, Mr. Weinstein, Holualoa, and Mission District's failures to make their required capital contributions under the Operating Agreement in the first place, and misrepresentations to IBNV regarding such capital contributions.

80.    The HREF Loan and Amended OA also effectively prevent Monier from paying the unpaid attorneys' fees, costs, late fees, and renewal fees due to IBNV under the Completion Loan, Guaranty, and IBNV LOC Loan, which Monier refused to pay from the $8,000,000 amount to allow it to instead repay Mission District's capital contribution, as described in greater detail below.

81.    Monier adopted the Amended OA without IBNV's knowledge or consent.

**Failures, Omissions, and Misrepresentations By Monier's Managers**

82.    Mr. Dixon and Mr. Weinstein were designated the managers of Monier under the Operating Agreement.

83.    Under the Operating Agreement, Mr. Dixon and Mr. Weinstein, as managers, each "owes the Members and the Company the fiduciary duties of loyalty and care (equivalent to that owed by either officers or directors of Arizona corporations to shareholders and/or to the corporation)."

84.    The Operating Agreement required the following capital contributions to establish the respective membership percentage interests of the members:

| Member | Percent Interest | Required Capital |
|---|---|---|
| IBNV | 20.1% | IBNV LOC Loan up to $2,253,107 |
| Holualoa | 10% | $550,000 in cash |
| Mission District Partners, LLC | 33.7% | $3,282,000 in "assets and funds" |
| The Dixons and Weinsteins | 36.2% | $3,525,144 in "assets and funds" |

*Misrepresentations/Omissions re Mission District's Capital Contribution*

85.    Mr. Dixon and Mr. Weinstein own and/or control, directly or indirectly, Mission District Partners, LLC. Therefore, the Dixons and Weinsteins were to own a majority interest in the collective amount of 69.9% of Monier based on their purported capital contributions.

86.    Monier's books and records indicate that Mission District contributed $2,380,180.55. There is no evidence that Mission District contributed the balance of its capital contribution.

87.    Monier's books contain other entries providing credits to Mission District's capital account, but there are no corresponding bank deposits that match these entries.

88.    Thus, upon information and belief, Mission District was obligated to pay an additional $901,819.45 which was never provided.

*Misrepresentations/Omissions re Holualoa's Capital Contribution*

89.    Pursuant to the Operating Agreement, Holualoa was required to contribute $550,000 in cash in exchange for its 10% interest.

90.    Mr. Dixon and Mr. Weinstein represented to IBNV that all capital contributions had been made, including Holualoa's.

91.    However, once IBNV obtained its mandatory injunction allowing IBNV to inspect Monier's books and records, IBNV discovered Holualoa did not make its required capital contribution.

92.    Instead of contributing $550,000 in cash, Monier's books show Holualoa was credited with journal entries totaling $450,000 in "development costs".

93.    There are no deposits or corresponding expenditures on Monier's bank statements showing Holualoa paid $450,000 to Monier.

94.    Despite demand, Monier failed and refused to provide any invoices, contracts, or records to show support the $450,000 in journal entries.

95.    Due to this lack of support, IBNV suspects that Holualoa did not actually pay for $450,000 of development costs for the Project.

96.    Even if Holualoa did pay for $450,000 of development costs, such amount is $100,000 less than the required capital contribution under the Operating Agreement.

97.    Mr. Dixon and Mr. Weinstein never disclosed to IBNV that Holualoa failed to contribute its required capital contribution, and instead have allowed Holualoa to maintain its full 10% interest in Monier.

*Misrepresentations/Omissions re the Dixons & Weinsteins Capital Contributions*

98.    The Operating Agreement requires the Dixons and Weinsteins personally to contribute $3,525,144 in "funds and assets" to Monier.

99.    Originally, Mr. Dixon and Mr. Weinstein represented to Plaintiff that they were contributing the land for the Project in satisfaction for their capital contribution, claiming it had a value of over $3.5 million.

100.    However, Mr. Dixon and Mr. Weinstein did not disclose to IBNV that they did not actually contribute the land.  Instead, *Monier purchased* the land from Rio Nuevo for only $2,400,000 the same month the Operating Agreement was signed.

-15-

101.    Even worse, Mr. Dixon and Mr. Weinstein did not purchase the land with their own funds.  Instead, unbeknownst to IBNV, Mr. Dixon and Mr. Weinstein *caused Monier to borrow $2.4 million* from a lender, Rio Nuevo, for the purchase of the land. True and correct copies of the documents evidencing the Rio Nuevo loan are attached hereto as **Exhibit P**.

102.    Mr. Dixon and Mr. Weinstein did not disclose to IBNV that not only did they not pay for the land, but that they were "marking up" the purchase price of the land by 46% to inflate their purported capital contribution.

103.    The Rio Nuevo loan was not disclosed to IBNV at or near the time it was entered into.[2]

104.    Because the HUD Lender for the Project required the land to be contributed free and clear of any liens, Mr. Dixon and Mr. Weinstein then schemed to pledge their membership interests in Monier and Mission District's membership interests in Monier as collateral for the Rio Nuevo loan.[3]

105.    The pledge of the membership interests in Monier described in paragraph 103 were not disclosed to IBNV at or near the time the pledge was entered into.

106.    Monier's Operating Agreement prohibits the pledge of the membership interests entered into with Rio Nuevo.

107.    Following the books and records inspection, IBNV discovered the evidence of the Rio Nuevo loan and the fact that Monier was obligated to repay that loan – i.e., the "contribution" of the land was not a capital contribution at all.

---

[2]    The Rio Nuevo loan documents were executed on the same day that IBNV signed the Operating Agreement, effectively preventing IBNV from learning in advance that Mr. Dixon and Mr. Weinstein had obtained a loan and pledged 69% of Monier's membership interest from the very first day of IBNV's membership in Monier.

[3]    Mission District's membership interest in Monier was not directly pledged.  Instead, The Gadsden Company, LLC, which is the 75% member of Mission District, pledged its membership interest in Mission District to Rio Nuevo as collateral, which in turn would allow Rio Nuevo to control Mission District and its membership interest in Monier.  This indirect pledge also violates the Operating Agreement.

108.    Thereafter, IBNV requested evidence showing that such "funds and assets" had been contributed by the Dixons, Weinsteins, and Holualoa as required under the Operating Agreement.  IBNV further demanded evidence of actual deposits of cash or payment of costs. *See* emails between Monier and IBNV counsel dated June 21-July 7, 2023, a true and correct copy of which is attached hereto as **Exhibit Q**, and therein referenced HUD Closing Statement, a true and correct copy of which is attached hereto as **Exhibit R**.

109.    After repeated requests from IBNV's counsel for such information, Monier only pointed only to: (i) a single entry on HUD Closing Statement which contains an owner "source" contribution of $2,174,205, and (ii) "the Land Value demonstrated on page 3", which was stated at $3.5 million.  IBNV's counsel again requested proof of actual deposits or payments made, but no additional records were provided. *See* **Exhibit Q and Exhibit R**.

110.    In actuality, Monier's books reveal that Monier's equity ledgers and balance sheet show *zero* capital contributions from the Dixons and Weinsteins.

111.    Certainly, the Dixons and Weinsteins did not contribute over $3.5 million in capital at or near the time the Operating Agreement was executed, as represented.

112.    Nevertheless, the Dixons and Weinsteins have maintained a 36.2% membership interest without investing any actual capital for that interest.

113.    Despite all of the foregoing, Mr. Dixon and Mr. Weinstein represented to IBNV that all of the initial member contributions had been made, including their personal capital contributions.

*Misrepresentations/Omissions Relating to the HREF "Refinancing"*

114.    Upon information and belief, the Rio Nuevo loan which financed the purchase of the land for the Project was set to mature sometime in 2024.

-17-

115. Because: (i) Monier was liable for the Rio Nuevo loan, (ii) the Emerald Loan (defined below) for which the Dixons and Weinsteins were liable had already matured, and (iii) the Dixons, Weinsteins, and Mission District had pledged 69% of the membership interests in Monier, the Project was in immediate peril and the majority membership interests were at risk of being transferred to a new majority member without consent of IBNV, all in violation of the Operating Agreement.

116. To protect their misdealings and undisclosed loans and pledges, Mr. Dixon and Mr. Weinstein, as managers of Monier with fiduciary duties owing to IBNV, then began negotiating with HREF for a capital infusion to Monier, which they have characterized as a "refinancing".

117. However, the Dixons' and Weinsteins' capital contribution was, itself, required to be unencumbered and for the benefit of Monier, in exchange for its membership percentage interest. Monier was not supposed to repay the Dixons'/Weinsteins' capital contribution.

118. Mr. Dixon and Mr. Weinstein then negotiated with HREF, after the Maricopa County Lawsuit had been filed by IBNV, without any notice or disclosure of such negotiations to IBNV.

119. Mr. Dixon and Mr. Weinstein then amended Monier's Operating Agreement to allow HREF to become a new member for an $8 million infusion of capital. From the $8 million, Mr. Dixon and Mr. Weinstein then paid $2.4 million to Rio Nuevo, without notice or consent to IBNV.

120. By virtue of this scheme, Mr. Dixon and Mr. Weinstein caused Monier to repay the Dixons'/Weinsteins' entire original capital contribution of $2.4 million, meaning the Dixons/Weinsteins have retained a 33.7% membership interest in Monier without literally contributing a single penny of their own money.

-18-

121.    Even worse, as part of the structure of the HREF "refinancing": (i) Mission District, the Dixons, and the Weinsteins again pledged their membership interests to HREF as collateral, in violation of the Operating Agreement, and (ii) Mr. Weinstein and Mr. Dixon negotiated to give HREF a preferred priority return on its $8 million, to the detriment of IBNV.

### *Other Breaches/Failures*

122.    Section 7.1 of the Operating Agreement states:

> If any of the following occurs (each, an "Event of Default"), [IBNV] has the right, but not the obligation, to take over as Manager of [Monier] and the Subsidiary and [IBNV] will then receive compensation at the rate of cost plus twenty percent (20%) for the staff and other operational expenses associated with management of [Monier]:
>
> A. the Managers fall behind by more than twenty-five percent (25%) on the schedule outlined in the HUD-5372 Progress Schedule;
>
> B. any default in connection with the HUD financing is not timely cured … [4]

123.    Similarly, the term sheet states that Mr. Dixon and Mr. Weinstein "will be considered in default if any of the following occur prior to repayment in full of [IBNV's] capital account and the L/C: failure to complete construction of the project within the mutually agreed upon construction schedule; HUD loan default is not timely cured; failure to provide proper monthly reporting, including monthly reports detailing the specific uses of the Partnership Loan and anticipated remaining carrying costs to construction completion. … Upon the occurrence of any Event of Default, control of [] Monier will need to be transferred to [IBNV]."

---

[4]    The Amended OA <u>deletes</u> Section 7.1 of the Operating Agreement in its entirety, and replaces it with language that omits (i) any reference to HUD-related defaults and (ii) any remedies of IBNV in the event of a failure of management.

4896-1686-7715\5

124.    In violation of the Operating Agreement and Term Sheet, Monier fell more than 25% behind the HUD-5372 Progress Schedule on construction progress of the Project.

125.    Section 6.6(A)(ii)(f) of the Operating Agreement requires that "[d]uring any period of time the IBNV LOC remains outstanding, cash reserves will not be less than Two Hundred Thousand & 00/100 Dollars ($200,000.00) (the "Fixed Reserve") and all Net Cash Flow prior to final endorsement from HUD will be added to the cash reserves."

126.    In violation of the Operating Agreement, Monier failed to maintain the Fixed Reserve through and including September 7, 2023.[5]

127.    In violation of the Operating Agreement and Term Sheet, Monier failed to timely obtain the HUD Final Endorsement. As a result of this failure, HUD reinstated $2,000,000 in previously-waived extension fees.[6]

128.    Also in violation of the Operating Agreement and Term Sheet, Monier failed to adhere to HUD property-level cash restrictions. Specifically, it appears payments were improperly made to, among others: (i) contractors for the commercial space at the Project, the tenant improvements for which are not covered by the HUD 221(d)(4) loan; (ii) entities owned or controlled by Mr. Dixon and Mr. Weinstein, (iii) a prospective bridge lender, and (iv) the personal attorneys of Mr. Dixon and Mr. Weinstein.

129.    Notably, from September 20, 2022 to April 27, 2023, Monier made over $600,000 in transfers from Monier's accounts which are not supported by invoices or shown to be in compliance with the Operating Agreement and Term Sheet.

130.    Upon IBNV's request for all invoices supporting payments made by

---

[5]    The Amended OA deletes Section 6.6(A)(ii)(f) of the Operating Agreement in its entirety, and replaces it with language that contemplates reserves "as the Managers reasonably deem necessary."

[6]    Upon information and belief, this amount was ultimately waived.  However, due to delays, Monier was required to pay hundreds of thousands in loan extension fees and other penalties due to the delays and delay/inability to get the HUD final endorsement mismanagement by the managers.

4896-1686-7715\5

Monier, Monier responded that invoicing is handled by its third-party management company. *See* emails between Monier and IBNV counsel dated June 16-29, 2023 relating to such invoices, a true and correct copy of which is attached hereto as **Exhibit S**.

131.   Monier did not offer a date upon which such third party would be providing supporting invoices, and no such invoices have been provided to date.

132.   IBNV subpoenaed the third-party management company for such invoices, and Monier objected to the subpoena.

133.   As a result of their management and operational failure, Mr. Dixon and Mr. Weinstein personally took out a loan in the amount of $1,650,000 from Emerald Debt, LLC (the "Emerald Loan") on or around January 8, 2021.  Monier was not a borrower under the Emerald Loan. True and correct copies of the documents evidencing the Emerald Loan are attached hereto as **Exhibit T**.

134.   In connection with the HREF "refinancing", Mr. Dixon and Mr. Weinstein caused Monier to pay approximately $2,446,632.10 to payoff off the Emerald Loan, even though Monier was not an obligor.

135.   The Term Sheet states "[IBNV] shall have first right of refusal for any future short term loans needed for the [P]roject. [IBNV] shall receive first right of refusal to participate in the next three future investment opportunities of [Weinstein and Dixon]."

136.   Paragraph 20 of the Note states "As additional consideration in connection with making the loan contemplated by this Note available, Borrower is granting Note Holder a first right of refusal for any short-term loans needed for the Project as well as a first right of refusal to participate in the next three future investment opportunities in which Gerald J. Dixon and/or Adam Weinstein are the sponsors. The first rights of refusal set forth in this Section 20 will remain enforceable and survive any expiration, termination or satisfaction of this Note."

137.   In violation of the Term Sheet and Note, Monier did not offer IBNV the

right to make the Emerald Loan or the HREF "refinancing".

**Improper Transfer/Pledge of Membership Interest**

138.    Section 8.1 of the Operating Agreement provides that "transfers of Units will be subject to a right of first refusal" and that "[b]efore any Units may be sold or transferred (including transfer by operation of law), such Units must first be offered to [Monier] and the other Members" in accordance with certain notice and election procedures.

139.    Section 8.2 of the Operating Agreement states that "Units in [Monier] may not be transferred if after such Transfer, Sharing Ratios of fifty percent (50%) or more (excluding Units transferred by gift, bequest or inheritance) will have been transferred during the twelve (12) month period ending on the date of such proposed Transfer."

140.    Mr. Weinstein and Mr. Dixon have caused Monier to violate these transfer provisions on at least two occasions, in connection with the Rio Nuevo loan and in connection with the HREF refinancing.

**Remedies**

141.    Section 10.1(B) of the Operating Agreement states that "[a]ny purported or attempted Transfer by a Member in violation of Article VIII hereof will be an immediate Default by such Member."

142.    Section 10.1(C)(vii) of the Operating Agreement states "[t]he occurrence of any of the following will be an immediate Default by the Member so affected … [a] lien is placed on a Member's Units or Membership Interest which is not removed within thirty (30) days after the lien is perfected."

143.    Mr. Weinstein and Mr. Dixon pledged a majority membership interest in Monier as collateral to Rio Nuevo in connection Rio Nuevo's loan.

144.    In violation of the Operating Agreement, Mr. Weinstein and Mr. Dixon did not offer such membership interest to IBNV.

4896-1686-7715\5

145.    Moreover, the Amended OA deletes Section 10.1(C)(vii) in its entirety, allowing this provision to be circumvented by a 75% vote of the members, even though the members never put in their required capital contributions in the first instance to allow them to hold such interests.

146.    Moreover, according to the Amended OA, Monier purportedly obtained loans from Rio Nuevo, Emerald, Holualoa, Mission District, Mr. Weinstein, Mrs. Weinstein, Mr. Dixon, and Mrs. Dixon related to the Project without first seeking such funding from IBNV.

147.    Section 5.1(D)(i) of the Operating Agreement states that "[r]epayment of the amount drawn upon the IBNV LOC by the HUD lender plus interest will be required before any other Capital Account repayment or Distributions are paid to any other Member."

148.    The Term Sheet states that "[r]epayment of the amount drawn upon against the Letters of Credit is subject to the waterfall outlined within the [] Operating Agreement; repayment balance shall include both Loan principal and any outstanding accrued interest and late fees at the time of distribution."

149.    In violation of the Operating Agreement and Term Sheet, Monier made payments to Mr. Weinstein, Mr. Dixon, Monier's attorneys, the Dixons' and Weinsteins' attorneys, Rio Nuevo and Emerald Debt, LLC prior to repaying the entire amount of the IBNV LOC Loan, including the late fees.

150.    The Completion Note also contains a priority provision, requiring full repayment of the amounts due thereunder before payment to any loans made by any entities controlled by Gerald J. Dixon and/or Adam Weinstein.

151.    Section 10.3 of the Operating Agreement states that "[u]pon the occurrence of a Default by any Member, such Defaulting Member will not have any right to participate in the management or control of the business and affairs of the Company and

any and all provisions hereof with respect to management and control will be determined without including the Units of the Defaulting Member."

## FIRST CLAIM FOR RELIEF

### (Breach of Fiduciary Duty – IBNV v. Mr. Dixon, Mr. Weinstein, Mrs. Dixon, and Mrs. Weinstein)

152. IBNV hereby incorporates each allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

153. Monier is a manager-managed limited liability company.

154. Mr. Weinstein and Mr. Dixon are the managers of Monier.

155. IBNV is a member of Monier.

156. As the managers of Monier, Weinstein and Dixon owed fiduciary duties of loyalty and care to Monier's members, including IBNV, under the Operating Agreement and Arizona law.

157. Weinstein and Dixon breached their fiduciary duty of loyalty to IBNV by, among other things, pledging their membership interest in Monier in violation of the Operating Agreement, failing to ensure all membership contributions under Section 5.1 of the Operating Agreement were fully and properly received by Monier, utilizing the IBNV LOC Loan for improper expenses, causing Monier to repay the Rio Nuevo loan (in lieu of the Dixon/Weinstein capital contribution), causing Monier to obtain loans without first offering them to IBNV, causing Monier to repay the Emerald Loan, and substantially altering IBNV's ownership interest and rights under the Operating Agreement without IBNV's knowledge or consent due to their mismanagement and omissions.

158. Weinstein and Dixon further permitted Monier's members, Holualoa, Mission District Partners, the Weinsteins and the Dixons, to retain their percentage interests even though they had not contributed all of their required capital.

-24-

159.   Such actions also allowed the Dixons and Weinsteins, together with their company, Mission District, to retain majority control of Monier even though they did not contribute their required capital.

160.   As an actual and proximate result of Weinstein and Dixon's breaches of their fiduciary duties, IBNV has been damaged in an amount to be proven at trial.

161.   Weinstein, Dixon, and their marital communities are liable to IBNV for compensatory damages resulting in Weinstein and Dixon's breaches of their fiduciary duties, as all acts were undertaken for the benefit of their marital communities.

162.   Weinstein and Dixon's breaches of their fiduciary duties to IBNV were willful, reckless, done with an evil mind, and in blatant disregard of IBNV's rights. Accordingly, Mr. Dixon, Mr. Weinstein, Mrs. Dixon, and Mrs. Weinstein are additionally liable for punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

**(Breach of the Covenant of Good Faith and Fair Dealing – IBNV v. Monier and Mr. Dixon, Mr. Weinstein, Mrs. Dixon, and Mrs. Weinstein)**

163.   IBNV hereby incorporates each allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

164.   Arizona law implies a covenant of good faith and fair dealing in every contract.

165.   The covenant of good faith and fair dealing prohibits a party from doing anything to prevent the other party to the contract from receiving the benefits and entitlements of the contract.

166.   The Operating Agreement is a valid and enforceable contract.

167.   Monier, Weinstein and Dixon breached the implied covenant of good faith and fair dealing by, among other things, pledging their membership interest in Monier in violation of the Operating Agreement, failing to ensure all membership contributions

under Section 5.1 of the Operating Agreement were fully and properly received by Monier, utilizing the IBNV LOC Loan for improper expenses, causing Monier to repay the Rio Nuevo loan (in lieu of the Dixon/Weinstein capital contribution), causing Monier to obtain loans without first offering them to IBNV, causing Monier to repay the Emerald Loan, and substantially altering IBNV's ownership interest and rights under the Operating Agreement without IBNV's knowledge or consent due to their mismanagement and omissions.

168.    Such actions prevent IBNV from benefitting from entering into the Operating Agreement.

169.    Such actions also allowed the Dixons and Weinsteins, together with their company, Mission District, to retain majority control of Monier even though they did not contribute their required capital.

170.    Weinstein, Dixon, and their marital communities are liable to IBNV for compensatory damages resulting in Weinstein and Dixon's breaches, as all acts were undertaken for the benefit of their marital communities.

171.    IBNV has been damaged by Monier, Mr. Dixon and Mr. Weinstein's breach in an amount to be proven at trial.

172.    IBNV is also entitled to recover its reasonable attorneys' fees and costs incurred herein pursuant to A.R.S. §§ 12-341 and 12-341.01

**THIRD CLAIM FOR RELIEF**

**(Breach of Contract (Member Contributions))**

**IBNV v. Mission District, Holualoa, Mr. Dixon and Mr. Weinstein)**

173.    IBNV hereby incorporates each allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

174.    The Operating Agreement is a valid and enforceable contract.

4896-1686-7715\5

175. Pursuant to the Operating Agreement, Mr. Dixon, Mr. Weinstein, Mrs. Dixon, and Mrs. Weinstein, Mission District, and Holualoa were obligated to contribute certain cash and assets to the Monier.

176. The Dixons, Weinsteins, Mission District, and Holualoa breached the Operating Agreement by failing to make all of the required contributions.

177. IBNV has been damaged by Mr. Dixon's, Mr. Weinstein's, Mrs. Dixon's, and Mrs. Weinstein's, Mission District's, and Holualoa's breaches because such breaches prevented appropriate development of the Project, which in turn prevented IBNV from benefitting from its membership interest in Monier.

178. Such breaches also allowed the Dixons and Weinsteins, together with their company, Mission District, to retain majority control of Monier even though they did not contribute their required capital.

179. Weinstein, Dixon, and their marital communities are liable to IBNV for compensatory damages resulting in Weinstein and Dixon's breaches, as all acts were undertaken for the benefit of their marital communities.

180. Pursuant to the Operating Agreement and A.R.S. §§ 12-341 and 12-341.01, Mission District, Holualoa, Mr. Dixon, and Mr. Weinstein are obligated to pay all attorneys' fees and other legal expenses incurred by IBNV in connection with the enforcement of its rights and remedies under the Operating Agreement.

**FOURTH CLAIM FOR RELIEF**

**(Negligent Misrepresentation – IBNV v. Monier, Mr. Dixon and Mr. Weinstein)**

181. IBNV hereby incorporates each allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

182. Weinstein and Dixon represented to IBNV that all member contributions owing to Monier had been made.

183.    Weinstein and Dixon represented that the Project would be developed in accordance with HUD regulations.

184.    Monier, Weinstein and Dixon omitted that: (i) Mission District only contributed to Monier $2,380,181, despite being credited over $3.2 million for its capital contribution, (ii) Mr. Dixon, Mr. Weinstein, Mrs. Dixon, Mrs. Weinstein and Holualoa did not make their full capital contributions, (iii) Weinstein and Dixon caused Monier to purchase the land for the Project, while representing that they contributed the land to satisfy their capital contribution, (iv) Weinstein and Dixon pledged their membership interest in Monier in exchange for the loan for Monier to purchase such land, and (v) Weinstein and Dixon caused Monier to be liable for the loan to Rio Nuevo and disguised/concealed the contribution of the land as their own alleged capital contribution.

185.    Monier, Weinstein and Dixon made such representations and omissions intending for IBNV to act upon them.

186.    Monier, Weinstein and Dixon failed to exercise reasonable care in communicating such representations and omitting material information.

187.    IBNV justifiably relied upon such representations and omissions in executing the Operating Agreement agreeing to only receive 20.1% for its investment.

188.    Weinstein, Dixon, and their marital communities are liable to IBNV for compensatory damages resulting in Weinstein and Dixon's negligent misrepresentations, as all acts were undertaken for the benefit of their marital communities.

189.    As a result of IBNV's reliance on such representations and omissions, IBNV has been damaged in an amount to be proven at trial.

190.    IBNV is also entitled to recover its reasonable attorneys' fees and costs incurred herein pursuant to A.R.S. §§ 12-341 and 12-341.01.

4896-1686-7715\5

**FIFTH CLAIM FOR RELIEF**

**(Fraudulent Misrepresentation – IBNV v. Monier, Mr. Dixon, Mr. Weinstein, Mrs. Dixon, and Mrs. Weinstein)**

191.    IBNV hereby incorporates each allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

192.    Monier, Weinstein and Dixon falsely represented to IBNV that all member contributions had to Monier had been made and that the Project would be developed in accordance with HUD regulations.

193.    Monier, Weinstein and Dixon omitted that: (i) Mission District only contributed to Monier $2,380,181, despite being credited over $3.2 million for its capital contribution, (ii) Mr. Dixon, Mr. Weinstein, Mrs. Dixon, Mrs. Weinstein and Holualoa did not make their full capital contributions, (iii) Weinstein and Dixon caused Monier to purchase the land for the Project, while representing that they contributed the land to satisfy their capital contribution, (iv) Weinstein and Dixon pledged their membership interest in Monier in exchange for the loan for Monier to purchase such land, and (v) Weinstein and Dixon caused Monier to be liable for the loan to Rio Nuevo and disguised/concealed the contribution of the land as their own alleged capital contribution.

194.    Monier, Weinstein and Dixon made such representations intending for IBNV to act upon them and invest in Monier.

195.    Monier, Weinstein and Dixon failed to exercise reasonable care in communicating such representations and omitting material information.

196.    IBNV justifiably relied upon such representations in executing the Operating Agreement and agreeing to only receive 20.1% for its investment.

197.    As a result of IBNV's reliance on such representations and omissions, IBNV has been damaged in an amount to be proven at trial.

198.    Weinstein, Dixon, and their marital communities are liable to IBNV for compensatory damages resulting in Weinstein and Dixon's fraudulent misrepresentations, as all acts were undertaken for the benefit of their marital communities.

199.    Weinstein's, Dixon's and Monier's acts were done with an evil mind and were (1) intended to cause harm, (2) were motivated by spite, and/or (3) were outrageous, creating a substantial risk of tremendous harm to IBNV.

200.    IBNV is also entitled to recover its reasonable attorneys' fees and costs incurred herein pursuant to A.R.S. §§ 12-341 and 12-341.01.

**SIXTH CLAIM FOR RELIEF**

**(Constructive Fraud – IBNV v. Mr. Dixon, Mr. Weinstein, Mrs. Dixon, and Mrs. Weinstein)**

201.    IBNV hereby incorporates each allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

202.    At all times relevant hereto, Mr. Dixon and Mr. Weinstein acted as managers of Monier.

203.    At all times relevant hereto, Mr. Dixon and Mr. Weinstein had a fiduciary relationship with IBNV.

204.    Mr. Dixon and Mr. Weinstein acted on behalf of IBNV in their management of Monier.

205.    Mr. Dixon and Mr. Weinstein induced IBNV into a trusting relationship, in part, by representing to IBNV that, among other things, all member contributions in Monier would be made in accordance with the terms of the Operating Agreement, that the Project would be developed in accordance with HUD regulations, and that IBNV would be paid back in full for the IBNV LOC Loan and the Completion Loan before any other payments were made to other members.

206.   As a result, IBNV placed its trust in Mr. Dixon and Mr. Weinstein, including based on the fiduciary duty imposed through the Operating Agreement, and relied on the trustworthiness of Mr. Dixon and Mr. Weinstein's statements and actions.

207.   As IBNV's fiduciary, Mr. Dixon and Mr. Weinstein were bound and obligated to act to and for the benefit of IBNV, and could not take any advantage for themselves related to their acts on behalf of IBNV.

208.   Mr. Dixon and Mr. Weinstein's management of Monier benefitted their own interests over IBNV's interests.

209.   Mr. Dixon and Mr. Weinstein breached their duty to IBNV by intentionally inducing IBNV to enter into the Operating Agreement by, among other things: (i) making misrepresentations about the member contributions actually made to Monier, (ii) causing Monier to be liable for the Rio Nuevo loan and concealing such fact from IBNV, (iii) proceeding with the HREF transaction to allow payments that benefited Mr. Dixon and Mr. Weinstein over IBNV, (iv) substantially altering IBNV's rights under the Operating Agreement without IBNV's knowledge or consent in an effort to dilute IBNV and avoid paying all amounts owed to IBNV.

210.   Mr. Dixon and Mr. Weinstein further breached their duty to IBNV by misusing IBNV's loan funds for unapproved expenses and for the payment of the Emerald Loan, all of which was concealed from IBNV.

211.   Weinstein, Dixon, and their marital communities are liable to IBNV for compensatory damages resulting in Weinstein and Dixon's breaches of their fiduciary duties, as all acts were undertaken for the benefit of their marital communities.

212.   The actions of Mr. Dixon and Mr. Weinstein as described herein were wanton, willful, made with an "evil mind," and a conscientious disregard of a substantial risk of injury to IBNV, to such a degree and extent as to warrant the imposition of punitive damages against the defendants, and each of them.

4896-1686-7715\5

1      **WHEREFORE**, IBNV prays for judgment against MONIER INVESTORS

2    MEMBER, LLC, an Arizona limited liability company, GERALD J. DIXON,

3    MARJORIE A. DIXON, ADAM WEINSTEIN, KIRA DIXON-WEINSTEIN,

4    HOLUALOA COMPANIES, LLC, and MISSION DISTRICT PARTNERS, LLC jointly

5    and severally, as follows:

6        1.    Awarding IBNV damages in an amount to be proven at trial;

7        2.    Awarding punitive damages in an amount to be proven at trial;

8        3.    Awarding pre-judgment and post-judgment interest on the foregoing

9    amounts at the highest rate allowed under applicable law;

10        4.    Pursuant to the Operating Agreement and A.R.S. § 29-3602(A)(2), ordering

11    that the percentage interests of the members of Monier be reduced in accordance with

12    their actual capital contributions provided, with the corresponding percentage interest of

13    IBNV to be increased;

14        5.    Pursuant to A.R.S. § 29-3602(A)(5), causing the Dixons, Weinsteins,

15    Holualoa and Mission District, to be disassociated as members of Monier;

16        6.    Awarding IBNV's costs and reasonable attorneys' fees incurred in

17    connection with this this lawsuit pursuant to A.R.S. §§ 12-341 and 12-341.01, with

18    interest thereon at the highest lawful rate from the entry of judgment herein until paid in

19    full; and

20        7.    Granting such other and further relief as the Court deems just and proper.

21

22

23

24

25

26

4896-1686-7715\5

1    RESPECTFULLY SUBMITTED this 14th day of November, 2023.

2                                          DORSEY & WHITNEY LLP
                                           2325 East Camelback Road, Suite 300
3                                          Phoenix, Arizona 85016

4

5                                   By    /s/ Isaac M. Gabriel
                                          Isaac M. Gabriel
6                                          Alissa Brice Castaneda
                                           Julie P. Ibrahim
7
                                          *Attorneys for Plaintiff*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

-33-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

### VERIFICATION

Allen Sands declares as follows:

I am an authorized representative for IB New Ventures, LLC in this action and, in that capacity, sign this Verification. I have read the foregoing Verified Complaint and state that matters contained therein are true to the best of my knowledge, information, and belief. Pursuant to the Arizona Rules of Civil Procedure, I declare under the penalty of perjury that the foregoing is true and correct.

Dated this _13th_ day of November, 2023.

_____
ALLEN SANDS

4896-1686-7715\4